1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| BOBBIE JO A., | Case No.:  19cv1184-KSC |
| Plaintiff, | |
| v. | **ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| ANDREW SAUL, Commissioner of Social Security, | **[Doc. Nos. 15, 16.]** |
| Defendant. | |

17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her disability benefits. [Doc. No. 1.]  Presently before the Court are: (1) plaintiff's Motion for Summary Judgment [Doc. No. 15]; (2) defendant's Opposition and Cross-Motion for Summary Judgment [Doc. No. 16]; (3) plaintiff's Reply in support of her Motion for Summary Judgment [Doc. No. 17]; and (6) the Administrative Record [Doc. Nos. 12, 13].  After careful consideration of the moving and opposing papers, as well as the Administrative Record and the applicable law, the Court finds that the ALJ's decision to deny benefits must be affirmed; plaintiff's Motion for Summary Judgment must be DENIED; and defendant's Motion for Summary Judgment must be GRANTED.

1

## I.      *Procedural History.*

2      Plaintiff filed an application for disability insurance benefits ("SSDI") on May 26,

3   2015, claiming she had been unable to work since February 24, 2014. [Doc. No. 13-1, at

4   pp. 2-19.]   On October 20, 2015, plaintiff's application was denied, because it was

5   determined that her condition was not severe enough to keep her from working.  [Doc. No.

6   12-10, at pp. 2-3.]  Plaintiff then submitted a request for reconsideration on November 19,

7   2015, which was denied on January 26, 2016.  [Doc. No. 12-10, at pp. 11-12; 13-14.]

8      On February 14, 2016, plaintiff requested a hearing on her disability claim, and a

9   hearing was then held before an ALJ on September 15, 2017.  [Doc. No. 12-10, at pp. 18-

10  19; Doc. No. 12-8, at pp. 2-35.]  In a written decision dated March 7, 2018, the ALJ

11  concluded plaintiff is not eligible for disability insurance benefits, because she is not

12  disabled.  [Doc. No. 12-2, at pp. 103-125.]  Plaintiff then requested review of the ALJ's

13  decision by the Appeals Council, but the Appeals Council concluded there was no basis

14  for changing the ALJ's decision.  Therefore, the ALJ's denial became the final decision of

15  the Commissioner.  [Doc. No. 12-2, at p. 2.]   Shortly thereafter, plaintiff filed her

16  Complaint in this action seeking review of the ALJ's decision.  [Doc. No. 1.]  On July 5,

17  2020, plaintiff filed a Consent to jurisdiction for all purposes by the undersigned Magistrate

18  Judge.  [Doc. No. 5.]

19  ## II.     *Standards of Review – Final Decision of the Commissioner.*

20      The final decision of the Commissioner must be affirmed if it is supported by

21  substantial evidence and if the Commissioner has applied the correct legal standards.

22  *Batson v. Comm'r of the Social Security Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004).

23  Under the substantial evidence standard, the Commissioner's findings are upheld if

24  supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the

25  record to support more than one rational interpretation, the District Court must defer to the

26  Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a

27  reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel,*

28  240 F.3d 1157, 1162 (9th Cir. 2001).  "In determining whether the Commissioner's findings

are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996).

### III.   *Discussion.*

#### A.   *Plaintiff's Claim for Disability Benefits.*

At the time her application for disability benefits was submitted on May 26, 2015, plaintiff reported her ability to work was limited by the following medical problems: lumbar spine discectomy; fusion at L5-S1; disc herniation; multi-level cervical spondylosis; fibromyalgia; Sjogren's syndrome; anxiety; shoulder arthroscopy; subacromial decompression; rotator cuff tear; panic attacks; left eye detached retina; and a right renal stone.  [Doc. No. 13-1, at p. 3 AR 1112.]

#### B.   *The ALJ's Analysis and Conclusions.*

The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 C.F.R. § 404.1520(a); *Batson*, 359 F.3d at 1194.  At steps one and two, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since February 24, 2014 and has the severe impairments of degenerative disk disease of the lumbar spine and spondylosis post lumber fusion, fibromyalgia, primary biliary cholangitis/cirrhosis, chronic kidney disease, Sjogren's syndrome, and hypergammaglobulinemia.  [Doc. 12-2, at p. 106.]  At step three, the ALJ concluded that plaintiff's impairments do not meet or equal any of the relevant listings in the SSA's Listing of Impairments.  [Doc. No. 12-2, at p. 111.]

At step four, the ALJ determines the claimant's residual functional capacity to work based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2). "Residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). As part of this assessment, the ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).

/ / /

After considering "the entire record," the ALJ concluded plaintiff has the residual functional capacity to perform "light work" with certain restrictions and is also capable of performing her past relevant work as a tax clerk.  The ALJ reasoned that plaintiff's past relevant work as a tax clerk or administrative assistance is classified as "sedentary" and "does not require the performance of work-related activities that are precluded by the claimant's residual functional capacity (20 CFR 404.1565)."  [Doc. No. 12-2, at pp. 111, 124.]

The ALJ also made an alternative finding at step five of the disability analysis.  If the applicant cannot perform past relevant work, the ALJ at step five must consider the residual functional capacity assessment, along with the applicant's age, education, and work experience, to determine whether the applicant could "make an adjustment to other work" that is available in significant numbers in the national economy.  20 C.F.R. § 404.1520(a)(4)(v); 42 U.S.C. § 1382c(a)(3)(B).

While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Considering her age, education, work experience, and residual functional capacity, and based on the testimony of a vocational expert, the ALJ concluded at step five that plaintiff could perform other jobs that exist in significant numbers in the national economy. [Doc. No. 12-2, at p. 125.]  Accordingly, the ALJ made a finding that plaintiff is not disabled.  [Doc. No. 12-2, at p. 125.]

### C.   *The Parties' Cross Motions for Summary Judgment.*

Plaintiff does not challenge the ALJ's findings at steps one, two, and three.  She only challenges the ALJ's step four determination that she retains the residual functional capacity for "light work" with certain limitations and that she can perform her past relevant work as a tax clerk or administrative assistance.  [Doc. No. 12-2, at p. 111.]  In this regard, plaintiff contends the ALJ rejected the opinion of examining physician, Jeffrey Bernicker, M.D., an orthopedic surgeon, without specific and legitimate reasons. Dr. Bernicker was designated as an "Agreed Medical Examiner" in an underlying

workers compensation matter.  He reviewed plaintiff's medical records back to 2002 and conducted physical examinations on May 1, 2013 and May 3, 2016.  [Doc. No. 15-1, at pp. 4-5, 7-8, referring to Doc. No. 13-4, at pp. 112-133; 136-162.]  Based on physical examinations and objective factors, Dr. Bernicker concluded after his second examination of plaintiff on May 3, 2016 that she had certain work restrictions because of the condition of her lumbar spine.  [Doc. No. 15-1, at p. 7, referring to Doc. No. 13-4, at p. 158.]  Plaintiff argues the ALJ did not state adequate reasons for rejecting "most if not all" of Dr. Bernicker's restrictions.  [Doc. No. 15-1, at p. 9 n.6.]

The ALJ's decision states that he afforded Dr. Bernicker's opinion concerning plaintiff's ability to work "partial weight," because it is "more restrictive than is appropriate given ***limited abnormal findings*** regarding the claimant's ***physical impairments*** and the claimant's ***good activities of daily living*.**"  [Doc. No. 12-2, at p. 122 (emphasis added).]  To support his conclusion as to "limited abnormal findings" relevant to plaintiff's physical impairments, the ALJ cited numerous exhibits from the record, and indicated these records "[s]pecifically" show plaintiff "has exhibited normal gait; inconsistent muscle weakness, straight leg raise, and reflexes involving the right lower extremity; inconsistent range of motion limitations; tenderness to palpation; mild tender point findings; and infrequent fatigue symptoms."  [Doc. No. 12-2, at p. 122.]  When "closely reviewed," plaintiff argues the ALJ's citations do not support his rejection of Dr. Bernicker's work restrictions.  [Doc. No. 15-1, at pp. 9-11.]

Plaintiff also argues the ALJ "badly mischaracterized and/or omitted" evidence about her activities of daily living to indicate she is not as limited as she claims.  For example, in evaluating the weight to be afforded Dr. Bernicker's recommended work restrictions, the ALJ stated that plaintiff "is able to go shopping in stores," but he omitted the remainder of the statement plaintiff made in her June 12, 2015 Function Report, which is that she goes grocery shopping for 45 minutes to an hour "maybe every 2 weeks" and uses a grocery scooter.  [Doc. No. 15-1, at p. 13, referring to Doc. No. 12-2, at p. 122; Doc. No. 13-1, at p. 37 (AR 1146).]  However, the Court notes that the ALJ's failure to mention

plaintiff's use of the scooter in this portion of his decision does not indicate he failed to consider this evidence.   In an earlier section of his report, the ALJ noted plaintiff's representation that she uses a mobility scooter to shop but stated this was "not medically indicated." [Doc. No. 12-2, at pp. 112-113.]  Plaintiff does not challenge the ALJ's finding in this regard.

Plaintiff further argues that the evidence in the record about her activities of daily living does not support the ALJ's rejection of Dr. Bernicker's work restrictions.  According to plaintiff, her reported activities of daily living do not show she is able "to lift more than 15 pounds; weight bear more than 30 minutes or 4 hours total in an 8-hour day; or *repetitively rotate, extend, bend, or flex the spine more than 4 hours in an 8-hour day."* [Doc. No. 15-1, at pp. 12-13 (emphasis added).]  Plaintiff's argument is unclear.  The ALJ's residual functional capacity assessment concludes that plaintiff has the capacity to perform "light work" as defined by Social Security regulations, but it does not include a finding that plaintiff can repetitively rotate, extend, bend, or flex the spine or that plaintiff must be able to do so to perform "light work" as defined by Social Security regulations.  Nor does the ALJ rely solely on plaintiff's reported activities of daily living as definitive proof she can perform "light work."

Defendant contends the ALJ's decision to deny benefits should be affirmed, because the ALJ properly considered all relevant evidence in the record and appropriately weighed conflicting medical opinions.  According to the defendant, the ALJ's residual functional capacity assessment satisfies the "substantial evidence" standard, because it is supported by four separate medical opinions and other evidence in the record.  [Doc. No. 16-1, at pp. 4-12.]

**D.**   ***Medical and Other Evidence in the Record.***

**1.**   ***Plaintiff's Work History.***

Beginning on February 24, 2009, plaintiff worked as a tax clerk or administrative assistant for the Board of Equalization.  According to plaintiff, her job duties included mostly data entry while sitting at a computer, but she also answered phones and handled

incoming and outgoing mail.  The physical requirements of her job included the ability to lift and carry 50 pounds.  [Doc. No. 13-4, at p. 112.]  Plaintiff eventually separated her ties with this employer in January of 2017, while her disability claim was still pending, because the employer was not able to accommodate a part-time schedule or work limitations to address her alleged medical condition.  [Doc. No. 12-8, at pp. 8-9.]

### 2.  *Plaintiff's Medical History.*

The following summary of plaintiff's medical history includes all exhibits cited by the ALJ to support his decision to afford Dr. Bernicker's work restrictions only "partial weight" because of "limited abnormal findings."  [Doc. No. 12-2, at p. 122.]

While at work on November 14, 2011, plaintiff pulled the top drawer of a file cabinet open, and the cabinet, which was not attached to the wall, began to fall forward on top of her.  She was able to brace the cabinet to prevent it from falling on top of her, but she noticed a "snap" in her low back with an immediate onset of pain.  When the pain got worse over the next few days, plaintiff sought medical attention.  [Doc. No. 13-4, at p. 113.]  An MRI completed on November 30, 2011 revealed "[m]oderate spinal stenosis with paracentral disk protrusion.  Disk bulge at L4/5 and mild central stenosis."  [Doc. No. 13-4, at p. 4.]

On December 15, 2011, an orthopedic spine surgeon performed a "lumber laminectomy at L4-5 and L5-S1."  [Doc. No. 13-4, at p. 113.]  Thereafter, plaintiff had eight weeks of physical therapy but "remained symptomatic."  [Doc. No. 13-4, at p. 113.]  However, she returned to work on February 12, 2012 in a modified capacity.  On August 12, 2012, she suffered a second injury when she tripped over a rug while walking into the office where she worked.  This resulted in increased symptoms in her lumbar spine and right leg.  She was then evaluated and referred to a pain management specialist, and she had some relief from her symptoms with an epidural steroid injection.  During this time, plaintiff continued to work six hours a day with limited physical demands.  [Doc. No. 13-4, at p. 113.]

/ / /

On May 1, 2013, plaintiff was evaluated by Jeffrey P. Bernicker, M.D.  As noted above, Dr. Bernicker is an orthopedic surgeon, who had been designated as the Agreed Medical Examiner in connection with an underlying workers compensation claim.  [Doc. No. 13-4, at p. 112.]  At this examination, plaintiff reported constant "8 out of 10" pain in her lower back radiating through her right leg and down to her foot.  Her symptoms increased with walking, sitting, or standing for more than 15 to 20 minutes, and she was having difficulty with daily living activities.  [Doc. No. 13-4, at p. 114.]

In his May 1, 2013 report, Dr. Bernicker concluded plaintiff could not be considered permanent and stationary, even though she had recently had a favorable response to an epidural steroid injection.  Based on her continued symptoms and the results of an MRI completed on April 22, 2013, Dr. Bernicker could not rule out the necessity for additional surgery – "conversion to fusion with instrumentation at the L4-5 and L5-S1 levels" by Dr. Tung as the consultant neurosurgeon.  [Doc. No. 13-4, at p. 131.]  In the meantime, it was Dr. Bernicker's view that plaintiff could continue "to work in a modified-duty capacity with restrictions to include no lifting greater than 5 to 10 pounds as well as the avoidance of prolonged weightbearing activities."  [Doc. No. 13-4, at p. 131.]  Dr. Bernicker also indicated plaintiff should be precluded from "repetitive movements of the spine" and should only work six hours per day.  [Doc. No. 13-4, at p. 131.]  Thereafter, plaintiff continued to have severe back pain radiating primarily into her right leg and foot and did not benefit significantly with conservative medical management, including physical therapy, acupuncture, massage, and pain medications.   [Doc. No. 13-4, at pp. 140-144.]

On March 5, 2014, plaintiff had a second surgery performed by Dr. Tung -- "[p]osterior lumbar laminectomy and discectomy w/interbody graft fusion, pedicle screws and rodding L5-S1."  [Doc. No. 13-4, at p. 145.]  After the surgery on March 15, 2014, Dr. Tung regularly reported that plaintiff was improving "compared to pre-op;" was able to significantly decrease pain medications; and could tolerate more activity.  However, plaintiff continued to complain of pain in her back and right leg.  [Doc. 13-2, at pp. 133, 139, 141, 142, 147.]  On April 29, 2014, Dr. Tung stated in a treatment note that plaintiff

had continued improvement of pain in her right leg and right foot with intermittent numbness in her right foot.  There was also less cramping in her right calf.  She was wearing a brace and walking unassisted.  Her gait was significantly improved, and her reliance on pain medications had decreased.  She was taking short walks to improve her strength.  [Doc. No. 13-2, at p. 147.]

Dr. Tung's treatment notes dated August 28, 2014 state that plaintiff "continues to improve after surgery.  She does note some residual pain constantly.  She has right leg pain 2-3x/wk.  Both of these are significantly improved compared to pre-op.  She has started some aqua therapy and has noticed some increased low back soreness.  She walks much better than pre-op and is able to tolerate more activity. . . .  She is working to discontinue pain medications and increase activity.  She will continue with conservative post-op medical management at this time."  [Doc. No. 13-2, at pp. 141-142.]

On October 2, 2014, plaintiff had an appointment with Dr. Kasendorf.  The record indicates that Dr. Kasendorf was involved in treating plaintiff "for pain medication management" and to work on a "regimen that will control her symptoms."  [Doc. No. 13-2, at p. 134.]  Dr. Kasendorf reported in his treatment notes on October 2, 2014 that plaintiff had limited range of motion in her lumbar spine; tenderness on the outside of her hip; weakness in her right dorsiflexion; decreased sensation; and a new onset of "trochanteric bursitis" in her hip likely due to gait dysfunction from her back condition.  A steroid injection was recommended.  [Doc. No. 13-3, at p. 90.]

In her next follow-up visit with Dr. Tung on October 9, 2014, plaintiff reported aching in her right hip, inner calf, and the arch of her foot; intermittent spasms in her calf and foot; and low back pain that was worse at night and with sitting or walking.  However, Dr. Tung noted that plaintiff was slowly improving and had "improved compared to pre-op."  [Doc. No. 13-2, at p. 139.]  She had a normal gait, station, and strength, and her walking had improved.  She was scheduled to start physical therapy.  [Doc. No. 13-2, at p. 139.]

/ / /

Plaintiff had an appointment with Frank J. Nolan, M.D., of Arthritis Consultants, on December 3, 2014. She told Dr. Nolan she had chronic numbness in her right foot and calf "with occasional radic symptoms involving the whole leg." [Doc. No. 13-3, at p. 24.] She also complained of back pain with spasms; chronic neck and shoulder pain (rotator cuff tendonitis bilaterally, right greater than left); and variable fatigue. Spasms in her back interrupted her sleep. Trigger points and tenderness in the muscles of her mid spine were also noted. Plaintiff had no other significant symptoms. Dr. Nolan placed an order for an injection of Toradol. [Doc. No. 13-3, at p. 24.]

On February 17, 2015, plaintiff had an office visit with Dr. Kasendorf and reported radiating low back pain; electric shock pain in her right leg and calf; increased pain in her right hip radiating into her groin; numbness in her right leg; and severe muscle spasms. Her pain was described as continuous but worse in the morning. She was having trouble sleeping despite taking Trazodone. Her pain medication was allowing her to function, but she still had pain throughout the day. Dr. Kasendorf also indicated in his notes that plaintiff had a limited range of motion, weakness, and reduced sensation. He believed the gait dysfunction from her back problems led to bursitis in her hip. In addition to pain medications, Dr. Kasendorf's recommendations included wearing a back brace, chiropractic care, spinal stimulation therapy, and follow up with a surgeon. [Doc. No. 13-3, at pp. 81-82.]

In his treatment notes dated March 3, 2015, Dr. Tung stated that prior to surgery plaintiff had "severe constant pain down the right leg and constant numbness," but radiating pain and numbness in her right leg, calf, and ankle, had been reduced to "intermittent" and were occurring two to three times per week "without warning." [Doc. No. 13-2, at pp. 133-134.] Therefore, she had been able "to significantly decrease pain medications." [Doc. No. 13-2, at p. 133.] Dr. Tung's view was that plaintiff was close to reaching "a point of maximum medical improvement," and he recommended that plaintiff continue under the care of Dr. Kasendorf "for pain medication management" and to work on a "regimen that will control her symptoms." [Doc. No. 13-2, at p. 134.]

Plaintiff's next visit with Dr. Nolan was on March 11, 2015.  Dr. Nolan's notes state that plaintiff had a depressed affect and continued to complain of migratory muscle pain in her lower back, right hip, knee, and foot; and persistent numbness in her right leg with intermittent muscle spasms.  Based on his physical examination, Dr. Nolan noted plaintiff had trigger points, muscle tenderness, and some sensory loss (right leg), but there was no swelling or tenderness in her trochanters (hips), and the range of motion in her hips was normal.  She had no other significant symptoms based on a 14-point review of systems. Dr. Nolan recommended that plaintiff "continue" to attempt to take part in an exercise program.  [Doc. No. 13-3, at p. 22.]

Dr. Kasendorf's treatment note dated May 13, 2015 expressed concern that plaintiff was "getting progressively worsened neurological function," could be at risk for a fall, and might require "further surgical intervention."  [Doc. No. 13-3, at p. 75.]  Plaintiff reported to Dr. Kasendorf that she had increased weakness and pain in her right leg and was unable to exercise or sit for any prolonged amount of time because of pain, numbness, and cramping.   Dr. Kasendorf's assessment indicates plaintiff was having an "acute flare of low back pain/sciatica."  [Doc. No. 13-3, at p. 75.]  He also noted that an "EMG performed a few months ago confirmed S1 radiculopathy."  [Doc. No. 13-3, at p. 75.]  In addition to pain medications, Dr. Kasendorf recommended using a back brace; spinal cord stimulation therapy; and "pain psychology."  [Doc. No. 13-3, at p. 76.]  He further recommended that plaintiff obtain a second opinion concerning another "lumbar surgery."  [Doc. No. 13-3, at p. 76.]

As noted above, plaintiff filed her application for disability benefits on May 26, 2015.  Shortly thereafter, on June 12, 2015, plaintiff completed a Function Report in connection with her disability claim.  [Doc. No. 13-1, at pp. 34-42.]  On this form, plaintiff represented she was limited in her ability to work because of walking with right "drop foot," back pain, right leg numbness, right groin pain, muscle spasms, right arm weakness, numbness, difficulty with seeing and focusing, depression because of circumstances,

/ / /

1  inability to sit or stand long, need to lay down and rest, and difficulty driving with her right
2  foot.  [Doc. No. 13-1, at p. 34.]

3      On the Function Report, plaintiff did indicate she was able to prepare simple meals
4  daily as needed for 10 to 15 minutes.  However, she represented she was not able to prepare
5  home cooked meals, because it required her to stand too long and because bending and
6  twisting caused pain.  She was also able to wash a few dishes and do laundry when needed.
7  Her son helped her with sweeping, mopping, vacuuming, and cleaning.  A neighbor helped
8  her with trash.  [Doc. No. 13-1, at p. 36.]  Plaintiff further represented she did not do much
9  house or yard work, because she would need to take more medications.  She said she did
10 not go outside much, because she was taking medication and had pain, but she was able to
11 get groceries every 2 weeks (45 minutes to 1 hour) using a scooter.  [Doc. No. 13-1, at p.
12 37.]

13     On August 13, 2015, plaintiff had a complete orthopaedic evaluation that was
14 requested by the Department of Social Services.  [Doc. No. 13-3, at pp. 96-100.]  The
15 examining physician was Herman R. Schoene, M.D., who is board certified in
16 orthopedics.  [Doc. No. 13-2, at p. 100.]  It appears that Dr. Schoene only reviewed a few
17 recent medical records unrelated to plaintiff's back injuries and surgeries.  Plaintiff did
18 tell Dr. Schoene she had had two back surgeries, including an "L5 to S1 fusion."  [Doc.
19 No. 13-3, at p. 97.]  Plaintiff also told Dr. Schoene she had pain in her upper and lower
20 back, foot, ankle, knee, neck, and hip.  [Doc. No. 13-3, at pp. 96-97.]  Plaintiff was
21 wearing a sling on her right arm during this appointment because of recent shoulder
22 surgery.  [Doc. No. 13-2, at p. 97.]

23     In the physical examination section of his evaluation, Dr. Schoene said plaintiff
24 was in no acute distress, had a normal station and gait, was able to arise from a sitting
25 position without difficulty, and got onto and off the examining table without difficulty.
26 Dr. Schoene also noted there was a normal range of motion in plaintiff's neck and left
27 shoulder, but she had a limited range of motion in her back.  Her elbows, wrists, and
28 hands were within normal limits.  The range of motion in plaintiff's hips, knees, and

ankles were also "within normal limits," and her strength was normal. [Doc. No. 13-2, at p. 99.] Based on his examination, Dr. Schoene concluded plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; and stand and walk 6 hours out of an 8-hour day. Her ability to push and pull with her upper extremities was limited due to shoulder surgery. It was Dr. Schoene's view that plaintiff had no postural or other limitations. [Doc. No. 13-2, at p. 100.]

Next, plaintiff had a follow-up appointment with Dr. Tung on January 26, 2016, and she reported the pain and numbness in her right leg was worse, was traveling into her right foot, and was affecting the way she walked. Dr. Tung noted plaintiff had a limited range of motion in her back, tenderness on the right side, weakness, spasms, trigger points, and decreased sensation. [Doc. No. 13-5, at p. 104.] He concluded plaintiff was "significantly disabled" at this time and could not return to work. Dr. Tung also expressed concern about plaintiff's use of pain medications. [Doc. No. 13-5, at p. 105.]

On May 3, 2016, plaintiff was again evaluated and examined by Dr. Bernicker, the Agreed Medical Examiner in her workers compensation case. [Doc. No. 13-4, at pp. 136-168.] As outlined above, Dr. Bernicker concluded plaintiff had certain work restrictions that were later rejected by the ALJ and that are now in dispute in plaintiff's Motion for Summary Judgment. [Doc. No. 15-1, at pp. 8-14.]

During this examination, plaintiff reported "constant severe pain radiating up" to the middle of her back and down through her groin, right hip, right leg, and right foot "with associated numbness and tingling." [Doc. No. 13-4, at p. 138.] Her symptoms reportedly increased "with twisting, stooping, bending, coughing, sneezing, pushing, and pulling. . . [and] with sitting, standing, and walking for 15-20 minutes." [Doc. No. 13-4, at p. 138.] She also reported difficulty with activities of daily living and said her symptoms increased after 15 to 20 minutes of sitting, standing, or walking. [Doc. No. 13-4, at p. 138.]

In the physical examination section of his lengthy report, Dr. Bernicker stated that plaintiff was in "no acute distress." [Doc. No. 13-4, at p. 156.] A "[m]otor examination within the lower extremities [was] normal 5/5 in all muscle groups tested." [Doc. No. 13-

4, at p. 156.]  Plaintiff was able to move around the examination room without guarding and had only moderate difficulty changing positions from sitting to standing.  Her "[h]eal-toe gait [was] well-preserved without evident limp or requirement for assistive devices." [Doc. No. 13-4, at p. 156.]  The range of motion in her back was limited, and radiating pain was noted with some movements.  Some tenderness was noted in her lower lumbar spine. [Doc. No. 13-4, at p. 156.]  A supine straight leg raising test was "30 degrees bilaterally with low back pain radiating to the plantar aspect of the foot on the right.  Sitting straight leg raising [was] to 70 degrees bilaterally with low back pain radiating to the plantar aspect of the foot on the right."  [Doc. No. 13-4, at p. 156.]  The range of motion in plaintiff's hips was "normal."  According to Dr. Bernicker, plaintiff had reached maximum medical improvement and was considered "permanent and stationary."  [Doc. No. 13-4, at p. 157.]

Dr. Bernicker evaluated plaintiff's disability based on the following objective factors:  (1) multiple MRI studies of plaintiff's lumbar spine; (2) the surgical incisions on plaintiff's posterior lumbar spine; (3) a final radiograph of plaintiff's lumbar spine "demonstrating retained posterior instrumentation at L5-S1 with apparent solid interbody and posterior-lateral fusions;" (4) restricted lumbar spine range of motion with paralumbar muscle spasm; (5) an EMG/nerve conduction study from December 3, 2014 demonstrating evidence of mild chronic right L5-S1 radiculopathy; and (6) a sensory deficit in plaintiff's lower right extremity.  [Doc. No. 13-4, at p. 158.]

Based on his review of medical records and his physical examination, Dr. Bernicker concluded plaintiff lost "approximately 50 percent of her pre-injury capacity for flexing, extending, bending, and rotating the spine."  [Doc. No. 13-4, at p. 158.]  Dr. Bernicker therefore opined that plaintiff's disability precluded her from:  (1) lifting greater than 15 pounds; (2) tolerating repetitive movements of the spine; (3) weightbearing for more than 30 minutes per hour before requiring a 30-minute sitting break; and (4) weightbearing for more than four hours in an eight-hour shift.  [Doc. No. 13-4, at p. 158.]  Dr. Bernicker's report further states that plaintiff is no longer capable of carrying out the full and regular

duties of her former job as an administrative assistant without "permanent modifications." [Doc. No. 13-4, at p. 161.]

It is Dr. Bernicker's view that plaintiff will need some or all the following in the future: "supportive pain treatment;" physical therapy; chiropractic, acupuncture, and massage therapy; and spinal cord stimulation. Plaintiff will also need yearly radiographs of the lumbar spine to assess "the possibility of stress transfer to the L4-5 level adjacent to the fusion construction," because she is "slightly predisposed as a result of surgery," and because there is already "evidence of a disc protrusion with an annular tear at this level." [Doc. No. 13-4, at p. 160.]  In other words, Dr. Bernicker could not rule out the need for future surgery "consisting of conversion to fusion at L4-5."  [Doc. No. 13-4, at pp. 160-161.]

On September 13, 2016, plaintiff had an appointment with Kenneth D. Vitale, M.D., U.C. San Diego Healthcare, for continued treatment of chronic neck pain and "tingling numbness" radiating into her forearm and hands that did not improve with physical therapy. [Doc. No. 13-6, at p. 2.]  At this time, plaintiff requested a second MRI of her cervical spine (neck). [Doc. No. 13-6, at p. 2.]  Dr. Vitale completed a physical examination, which was mostly normal:  "focused to area of concern:  Cervical spine.  No soft tissue swelling or effusion.  Tenderness:  No bony tenderness that reproduces pain on exam today.  Laxity [looseness]:  No new asymmetric laxity.  ROM [range of motion]:  Can flex and extend cervical spine, has more pain with extension.  Rotation and lateral bending results in increased tightness.  L>R.  Can perform stand to sit and sit to stand transfers without increase in cervical pain.  Other testing:  Spurling's maneuver increases symptoms in neck and mainly L side today.  Distal neurovascular exam:  appears grossly intact.  Gait: Appears grossly symmetric. Station:  balance adequate."  [Doc. No. 13-6, at p. 3.]  Results of EMG.  "This is a normal study.  There is no evidence for an entrapment neuropathy (i.e. carpal tunnel syndrome), peripheral neuropathy, or right cervical radiculopathy. This test cannot detect a pure sensory radiculopathy."  [Doc. No. 13-6, at p. 3.]  Dr. Vitale requested

a repeat MRI and advised plaintiff to continue with pain medication and physical therapy. [Doc. No. 13-6, at p. 4.]

After her repeat MRI, plaintiff returned to Dr. Vitale to review the results on October 25, 2016. [Doc. No. 13-6, at p. 10.] Plaintiff was advised by Dr. Vitale that there were no significant changes from her previous MRI. Dr. Vitale's progress notes state as follows: "She continues to have C4-5 and C5-6 degenerative changes resulting in overall moderate central canal stenosis. There is no nerve root compression or cord compression/cord signal changes per MRI report." [Doc. No. 13-6, at p. 12.] Based on the information before him, Dr. Vitale reached the following conclusion: "Continued chronic neck pain and bilateral upper extremity paresthesias [tingling/numbness]; [but] repeat MRI does not show significant interval change, and [she] has had EMG which was reported as negative for any neurological pathology. Symptoms are therefore likely combination of degenerative changes in cervical spine as well as myofascial referred pain radiating into BUE [bilateral upper extremities]." [Doc. No. 13-6, at p. 12.] Dr. Vitale reassured plaintiff there were no severe structural changes or nerve compression and recommended she continue with other pain treatments, such as acupuncture. [Doc. No. 13-6, at p. 13.]

On December 14, 2016, plaintiff had an appointment with Monica Guma, M.D., U.C. San Diego Healthcare, for an evaluation of Sjogren's syndrome. Plaintiff reported she had symptoms of Sjogren's syndrome in 1993 and 1996. She "got better" on prednisone, and she has not taken any prednisone since then. Dr. Guma ordered some labs to document the Sjogren's syndrome and completed a physical examination, which was mostly normal. The musculoskeletal portion of the examination revealed some tenderness but no swelling and a normal range of motion in plaintiff's neck, back, hips, and knees. [Doc. No. 13-6, at p. 44.] X-rays of her knees, hands, and feet were unremarkable, and there were no acute findings on x-rays of her cervical spine or her lumbar spine. There was no evidence of complication with the L-5 to S-1 interbody fusion. However, some mild to moderate degenerative changes were noted. The diagnosis of Sjogren's syndrome was confirmed, but she did not have any symptoms other than some joint stiffness and

some mild pain in her hands, which could be secondary to Sjogren's syndrome. The results of an EMG showed no motor radiculopathy or carpel tunnel. As in the past, plaintiff continued to complain of pain in her cervical spine and lumbar spine which irradiates. [Doc. No. 13-6, at pp. 45-46.]   The record also includes a follow-up evaluation by Dr. Guma May 17, 2017 with similar results. [Doc. No. 13-6, at p. 155.]

The record includes progress notes of an office visit with nurse practitioner, Rebecca A. McAlpin, dated March 30, 2017, which appear to be related to follow-up and monitoring of plaintiff's hypergammaglobulinemia (a blood disorder). [Doc. No. 13-6, at pp. 92, 100.] These notes indicate plaintiff complained of stress headaches, weakness and shortness of breath using stairs, persistent fatigue, and profound fatigue once per month. She reported sleeping about 8 hours but was waking up with pain from her back surgeries in 2011 and 2014 ("She rates her pain today at 8/10 at her right back, groin and left leg.") [Doc. No. 13-6, at p. 100.] However, she reported there were "[n]o *new* joint pains." [Doc. No. 13-6, at p. 100.]

At the request of the Department of Social Services, plaintiff had an internal medicine evaluation by Bahaa Girgis, M.D., on August 14, 2017. [Doc. No. 13-3, at pp. 160-165.] Plaintiff reported her main health problems were Sjogren's syndrome, chronic kidney disease, and chronic neck pain. Her reported medications included Plaquenil for multiple joint and muscle pains; Soma, a muscle relaxer; trazodone; diazepam; Norco (a narcotic); and Ursodiol. [Doc. No. 13-3, at p. 160.] According to the report prepared by Dr. Girgis, plaintiff had chronic "on and off" neck pain because of prior work injuries, and the pain increased with any kind of movement and decreased with rest and pain medication. [Doc. No. 13-3, at p. 161.] Plaintiff also told Dr. Girgis she sometimes has bilateral hand numbness, but an MRI indicated no acute findings. [Doc. No. 13-3, at p. 161.]

Notes of a physical examination by Dr. Girgis on August 14, 2017 state that the range of motion in plaintiff's back was "within normal limits," and there was no "tenderness to palpation over the midline and paraspinal areas." [Doc. No. 13-3, at p. 163.]

The range of motion in plaintiff's shoulders, elbows, wrists, hips, knees, and ankles was "grossly normal," and her "finger approximation" was "intact." [Doc. No. 13-3, at p. 163.] There was no muscle degeneration, and her strength was "5/5 throughout." [Doc. No. 13-3, at p. 164.] Dr. Girgis also noted plaintiff was able to get on and off the examining table without difficulty; her gait was normal; and she was not using any assistive devices to ambulate across the room. [Doc. No. 13-3, at p. 164.] Although Dr. Girgis noted she did not conduct "a complete physical examination for health purposes," she concluded "from an internal medicine standpoint," plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally; stand, walk, and sit for six hours out of an eight-hour day; and had no postural or other limitations. Dr. Girgis further concluded plaintiff could perform the postural activities of climbing, stooping, kneeling, crouching, and crawling; and the gross and fine motor skills of reaching, carrying, lifting, feeling, handling, and fingering with no limitations. [Doc. No. 13-3, at p. 165.]

### 3. *Plaintiff's Testimony at the September 15, 2017 Hearing.*

As to her activities of daily living, plaintiff testified she lives alone, and her son lives in Los Angeles. Prior to moving in March, she was spending time at church in a knitting club. After she moved, she stopped going to the church, because it was too far away, and she was unable to afford to spend money on gas to get there. [Doc. No. 12-8, at p. 18.] Plaintiff testified she can drive a car, and she drove herself to the hearing. [Doc. No. 12-8, at p. 18.] On a typical day, plaintiff testified she mostly stays home, so she can lay flat on the floor with her legs up over the sofa. Sometimes she moves to her bed, but her bed is not very comfortable, and she does not sleep well at night. [Doc. No. 12-8, at p. 18.]

Plaintiff also testified she prepares her own meals. She rarely goes out with friends and does not date, because of her back problems. She tries to maintain her home on her own, and her son helps her with vacuuming, mopping, or sweeping when he visits. [Doc. No. 12-8, at p. 19.] Her fatigue and muscle aches and pains are from fibromyalgia; hypergammaglobulinemia (a blood disorder); kidney disease; and Sjogren's syndrome. [Doc. No. 12-8, at p. 20.] She was taking about six different medications, including one

1  for her mental health (Prozac), and she was regularly seeing a therapist through her workers

2  compensation coverage.  [Doc. No. 12-8, at p. 21.]  Mentally, plaintiff believes she could

3  handle the stress of a job, but her physical health is holding her back.  [Doc. No. 12-8, at

4  p. 22.]

5    **E.    _The ALJ's Rejection of Dr. Bernicker's Opinion on Work Restrictions_.**

6        **1.    _Standards for the Weight Afforded Medical Opinions_.**

7        The opinion of an examining physician, such as Dr. Bernicker, is entitled to greater

8  weight than the opinion of a non-examining physician, and the uncontradicted opinion of

9  an examining physician cannot be rejected without "clear and convincing evidence."

10  _Lester v. Chater_, 81 F.3d 821, 831 (9th Cir. 1996).  If the opinion of an examining physician

11  is contradicted by the opinion of another doctor, the examining physician's opinion can

12  only be rejected "for specific and legitimate reasons that are supported by substantial

13  evidence in the record."  _Id._  "Specific, legitimate reasons for rejecting a physician's

14  opinion may include its reliance on a claimant's discredited subjective complaints,

15  inconsistency with medical records, inconsistency with a claimant's testimony, and

16  inconsistency with a claimant's daily activities."  _Tommasetti v. Astrue_, 533 F.3d 1035,

17  1040 (9th Cir. 2008).  As defendant points out, Dr. Bernicker's opinion is contradicted by

18  several other physicians [Doc. No. 16-1, at p. 5], so the ALJ must state specific and

19  legitimate reasons for rejecting it.

20        Factors to be considered in determining the weight afforded to a physician's opinion

21  include "the amount of relevant evidence that supports the opinion and the quality of the

22  explanation provided; the consistency of the medical opinion with the record as a whole;

23  the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree

24  of understanding a physician has of the [the SSA's] 'disability programs and their

25  evidentiary requirements' and the degree of [the physician's] familiarity with other

26  information in the case record."  _Orn v. Astrue_, 495 F.3d 625, 632 (9th Cir. 2007). _See also_

27  _Garrison v. Colvin_, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527.

28  / / /

An ALJ may discredit the opinion of a physician if it is "conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). A medical opinion can also be legitimately discounted or rejected if it is inconsistent "with the record as a whole." *Wells v. Colvin*, 727 F.3d 1061, 1072 (10th Cir. 2013).

### 2. *Residual Functional Capacity Assessments*.

A residual functional capacity assessment considers a claimant's "ability to meet the physical, mental, sensory, and other requirements of work. . . ." 20 C.F.R. § 404.1545(a)(4). In this case, only the physical demands of work activities are at issue, and these include "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching). . . ." 20 C.F.R. § 404.1545(b). Limiting factors, such as epilepsy, vision, hearing, and pain or other symptoms, may also be considered in a residual functional capacity assessment. 20 C.F.R. § 404.1545(d)&(e). After functional limitations or restrictions are assessed on a function-by-function basis, an individual's residual functional capacity is expressed in terms of exertional levels: "sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

### 3. *The ALJ's Residual Functional Capacity Assessment Compared With Dr. Bernicker's Opinion on Work Restrictions*.

The ALJ's residual functional capacity assessment states as follows: "[T]he claimant has the residual functional capacity to perform light work . . . , except: she can frequently reach, handle, finger, and feel bilaterally; frequently push and pull with either the arms or the legs; never climb, ladders, ropes, and scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; occasionally work at unprotected heights or around moving mechanical parts; frequently operate a motor vehicle; may only occasionally be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, or vibration; and should work in an

/ / /

20

environment with no more than moderate noise (such as an office environment)."  [Doc. No. 12-2, at p. 111.]

Social Security regulations define "light work" as follows:  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

In his "medical re-examination" of plaintiff completed May 3, 2016, Dr. Bernicker concluded plaintiff could return to work but was precluded from lifting more than 15 pounds, performing repetitive movements of the spine, and weightbearing (*i.e.*, standing or walking) greater than 30 minutes per hour before requiring a 30-minute sitting break. [Doc. No. 12-2, at p. 122, referring to Doc. No. 13-4, at p. 158.]  Dr. Bernicker also limited plaintiff to four hours of weight-bearing activity in an 8-hour shift.  [Doc. 12-2, at p. 122.]

As defendant contends, the ALJ's residual functional capacity assessment appears only "slightly less restrictive" than Dr. Bernicker's recommended work restrictions.  [Doc. No. 16-1, at p. 5.]  First, Dr. Bernicker's opinion is slightly more limiting as to plaintiff's ability to lift and carry.  The ALJ's view is that plaintiff can lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Dr. Bernicker's work restrictions preclude plaintiff from lifting more than 15 pounds. Dr. Bernicker did not express an opinion as to the frequency of plaintiff's ability to lift and carry 15 pounds.

Second, Dr. Bernicker concluded plaintiff lost "approximately 50 percent of her pre-injury capacity for flexing, extending, bending, and rotating the spine" and was precluded from performing repetitive movements of the spine.  [Doc. No. 13-4, at p. 158.]  The ALJ's

residual functional capacity assessment seems to account for this loss of physical capacity, because it states that plaintiff can only "occasionally balance, stoop, kneel, crouch, and crawl" and can "never climb ladders, robes, and scaffolds."  [Doc. No. 12-2, at p. 111.]

Third, and more significantly, the ALJ's view is that plaintiff is not limited in her ability to sit, stand, or walk during an eight-hour work day.  Dr. Bernicker's opinion is that plaintiff would need a 30-minute sitting break after standing or walking for 30 minutes and could not walk or stand for more than four hours in an eight-hour shift.  Dr. Bernicker does not express an opinion on plaintiff's ability to tolerate a sitting position during an eight-hour workday.  On the other hand, Dr. Bernicker's report does indicate he did not believe plaintiff was permanently unable to work at the time of his evaluation on May 3, 2016.  Dr. Bernicker's report only states that plaintiff could not carry out the full and regular duties of her former job as an administrative assistance without "permanent modifications," but he did not indicate what modifications he believed would be necessary for her to return to this job.  [Doc. No. 13-4, at p. 161.]  Regardless, plaintiff would be unable to perform "light work" as defined by Social Security regulations even if the ALJ adopted Dr. Bernicker's recommended work restrictions, because she would be unable to meet the less restrictive lifting, standing, and carrying requirements.

It also does not appear plaintiff would be considered disabled under Social Security regulations even if the ALJ did adopt all Dr. Bernicker's work restrictions.  Under Social Security regulations, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).  Without more, Dr. Bernicker's recommended work restrictions do not indicate plaintiff would be precluded from performing any of the activities of sedentary work.

/ / /

19cv1184-KSC

Finally, the Court cannot agree with plaintiff's contention the ALJ did not state legitimate and adequate reasons for affording Dr. Bernicker's opinion on work restrictions only "partial weight." [Doc. No. 12-2, at p. 122; Doc. No. 15-1, at pp. 7-9.]  As noted above, the Court has reviewed and summarized the exhibits cited by the ALJ in support of his conclusion that Dr. Bernicker's opinion on plaintiff's work limitations is "more restrictive" than appropriate "given limited abnormal findings" concerning plaintiff's "physical impairments" and her "good activities of daily living."  [Doc. No. 12-2, at p. 122.]  Contrary to plaintiff's contention, the cited exhibits from plaintiff's medical history, together with her statements about her daily living activities, do support the ALJ's conclusion in this regard, because they reveal many inconsistencies between plaintiff's claim of debilitating impairments and the observations of treating and examining physicians indicating plaintiff is not as impaired as she claims.

Clearly, the record indicates there were times when plaintiff was temporarily unable to work because of significant pain and impairments, as she had two back surgeries and shoulder surgery.  Regardless, the exhibits cited by the ALJ indicate plaintiff's physical health and symptoms improved following her second back surgery and following her shoulder surgery.  Although she expressed subjective complaints of pain in varying degrees throughout the record, the overall record is inconsistent with debilitating pain and impairments.  While there are many more examples in the medical records summarized above, the following examples are repeated here for illustrative purposes.

First, the ALJ cited Exhibit 5F, at pages 9 and 11, which are the treatment notes of Dr. Tung, who performed plaintiff's second back surgery.  [Doc. No. 12-2, at p. 122.]  On August 28, 2014, Dr. Tung reported plaintiff was continuing to improve after surgery; had some "residual" pain constantly; had right leg pain only two to three times per week; had "significantly improved compared to pre-op;" "walks much better;" could "tolerate more activity;" and was working to discontinue pain medications.  [Doc. No. 13-2, at p 141 (Ex. 5F, at p. 11).]  She also had "normal gait and station" and normal ("5/5") tone and muscle strength. [Doc. No. 13-2, at p 141 (Ex. 5F, at p. 11).]  Similarly, on October 9, 2014,

plaintiff reported pain, but Dr. Tung noted plaintiff was slowly improving and had "improved compared to pre-op." [Doc. No. 13-2, at p. 139 (Ex. 5F, at p. 9).]  She had a normal gait, normal station ("able to support weight on heels/toes"), normal strength and tone ("5/5), and her walking had improved.  She was scheduled to start physical therapy. [Doc. No. 13-2, at p. 139 (Ex. 5F, at p. 9).]

Second, the ALJ cited Exhibit 12F, at pages 3 and 4, an orthopedic evaluation completed by Dr. Schoene on August 13, 2015, more than a year after plaintiff's second back surgery. [Doc. No. 13-3, at pp. 96-100.]  In the physical examination section of his evaluation, Dr. Schoene observed that plaintiff was in no acute distress; had a normal station and gait; could sit and arise from sitting without difficulty; and could get on and off the examining table without difficulty.  The range of motion in plaintiff's neck, elbows, wrists, hands, hips, knees, and ankles were within normal limits.  Her strength was normal. Her lumbar spine was tender to touch, and "[l]ateral flexion is 15/25 degrees bilaterally, extension 10/25 degrees, forward flexion 45/90 degrees.  Straight leg raising is 90/90 degrees bilaterally." [Doc. No. 13-3, at p. 98.]

Third, on December 14, 2016 and May 17, 2017, Dr. Guma, a treating physician who evaluated plaintiff for Sjogren's syndrome, included the results of physical examinations in her treatment notes.  These notes were cited by the ALJ as Exhibit 30F, at pages 43 and 155.  According to Dr. Guma, a musculoskeletal examination revealed no inflammation; tenderness in some areas; normal gait; and a full range of motion in plaintiff's neck, shoulders, back, hips, and knees.  [Doc. No. 13-6, at pp. 44, 155.]  These treatment notes also indicate plaintiff was in "no apparent distress."  [Doc. No. 13-6, at pp. 43, 155.]

Fourth, the ALJ cited Exhibit 27F, at pages 45 and 46, which is part of Dr. Bernicker's report of his May 3, 2016 evaluation that is in dispute in plaintiff's Motion for Summary Judgment.  This evaluation took place almost two years after plaintiff's second back surgery.  At that time, plaintiff told Dr. Bernicker she had "constant severe pain." [Doc. No. 13-4, at p. 156.]  However, Dr. Bernicker's report says plaintiff was in

"no acute distress," was able to move around the examination room without guarding, and she could change positions from sitting to standing with only "moderate difficulty." [Doc. No. 13-4, at p. 156.] Dr. Bernicker's report further states that plaintiff's "[h]eal-toe gait [was] well-preserved without evident limp or requirement for assistive devices." [Doc. No. 13-4, at p. 156.] A "[m]otor examination within the lower extremities [was] normal 5/5 in all muscle groups tested." [Doc. No. 13-4, at p. 156.] The range of motion in plaintiff's back was limited, and radiating pain was noted with *some* movements. *Some* tenderness was noted in her lower lumbar spine. [Doc. No. 13-4, at p. 156.] The range of motion in plaintiff's hips was "normal." [Doc. No. 13-4, at p. 157.] Using the ALJ's terminology, these "limited abnormal findings" appear to be inconsistent with Dr. Bernicker's opinion plaintiff could only lift 15 pounds and would need a 30-minute sitting break after 30 minutes of standing or walking. In other words, Dr. Bernicker did not provide an adequate explanation for these recommended work limitations, and the limitations are inconsistent with many parts of the record, so the ALJ could and did legitimately reject them.

In sum, a review of the totality of cited exhibits indicates it was reasonable for the ALJ to infer from the many inconsistencies in the medical records over time, along with plaintiff's "good" activities of daily living, that she did not suffer from totally debilitating impairments. [Doc. No. 12-2, at p. 122.] Although it is true plaintiff's reported daily activities were limited, the level of her activities is significant when considered along with the inconsistencies cited above and in other parts of the record. Significantly, plaintiff represented she lived alone, was able to prepare simple meals, maintain her home with some assistance from her son, do her own laundry, shop (using a scooter), and drive a car to the hearing and to church activities. While these reported daily living activities do not, standing alone, prove plaintiff is capable of light work under Social Security regulations, they are supportive of the ALJ's conclusion to afford Dr. Bernicker's work limitations "partial weight" and to infer plaintiff was not so impaired she could not tolerate the lifting, carrying, walking, standing, and sitting requirements of light work as defined by Social

Security regulations.   [Doc. No. 12-2, at p. 122.]   In other words, when all the inconsistencies cited by the ALJ are viewed together, they constitute specific, legitimate reasons for rejecting Dr. Bernicker's more restrictive work limitations that are supported by substantial evidence in the medical records.

## V.   *Conclusion.*

Based on the foregoing, substantial evidence supports the ALJ's decision that plaintiff is not disabled, because she has the residual functional capacity to perform "light work," as defined by Social Security regulations, including her past relevant work as a tax clerk or administrative assistance.  The ALJ cited more than enough evidence in the record to support this conclusion.  Accordingly, IT IS HEREBY ORDERED that defendant's Motion for Summary Judgment is GRANTED and plaintiff's Motion for Summary Judgment is DENIED.   IT IS FURTHER ORDERED that the final decision of the Commissioner of Social Security is affirmed.  The Clerk of the Court shall enter judgment accordingly and terminate the case.

IT IS SO ORDERED.

Dated:  November 30, 2020

Hon. Karen S. Crawford
United States Magistrate Judge